**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

**MICHELLE WORRELL** — **CIVIL ACTION NO. 06-1701**

**VS.** — **JUDGE MELANÇON**

**COMMISSIONER SOCIAL SECURITY ADMINISTRATION** — **MAGISTRATE JUDGE METHVIN**

**REPORT AND RECOMMENDATION**

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED**.

***Background***

Born on February 12, 1975, Michelle Worrell ("Worrell") is currently 33 years old. Worrell has a high school equivalency diploma. She worked in the past as a personal care attendant, cashier, waitress, bartender, stocker and food preparer.[1] Worrell seeks disability insurance benefits and supplemental security income, alleging disability since May, 2002 due to depression, bipolar disorder, and anxiety disorder.[2] Worrell's application was denied on initial review, and following an administrative hearing, the ALJ denied benefits on March 31, 2006.[3] The Appeals Council denied review and Worrell timely filed this appeal.

---

[1] Tr. 95-102, 323-325.

[2] Tr. 320.

[3] Tr. 13-23.

***Assignment of Errors***

Worrell alleges the following errors: 1) the ALJ erred in assessing her residual functional capacity; and 2) the ALJ failed to sustain his burden at Step Five of the Evaluation Process.

***Standard of Review and Procedure for Analysis of Impairments***

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).[4] In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992).[5]

---

[4] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

[5] The procedure is as follows:

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, such as affective and depressive disorders, bipolar syndrome, panic attacks, and trauma-related anxiety symptoms here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[6]

In the instant case, the ALJ determined that Worrell's anxiety disorder and depressive disorder combined are severe impairments.[7] Relying on the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers which Worrell can perform, and therefore she is not disabled.[8]

***Findings and Conclusions***

***Relevant Medical History***

**Office of Mental Health** - (Tr. 135-139). On January 24, 2005, Worrell was referred to the Office of Mental Health due to concerns about worsening depression. The intake psychiatrist, Mary Margaret Gleason, M.D., noted that Worrell had been hospitalized at

---

[6] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004).

[7] Tr. 18.

[8] Tr. 22.

Vermillionville once in 1991 due to multiple suicide attempts. It was noted that she had taken Elavil in the past for migraines.

Dr. Gleason noted that Worrell was cooperative, made good eye contact, and had no psychomotor agitation or retardation. Her mood was depressed and angry. Her affect was full range, including sadness and anger. Her speech was 100% comprehensible and thought process was linear.

Dr. Gleason noted that Worrell's abuse by her father and her former partner likely make her more vulnerable to mood and anxiety symptoms and likely impacted her ability to develop a full range of coping skills. She noted, however, that Worrell demonstrated significant insight into her symptoms and had developed some impressive adaptive skills. She also noted that Worrell's experiences likely contributed to her stated difficulty with dealing with people. Dr. Gleason noted that Worrell's headache symptoms may be exacerbated by her emotional stresses, and her family history may predispose her to mood and anxiety symptoms as both her parents had psychiatric symptoms.

Dr. Gleason diagnosed anxiety disorder NOS 300.00 (sub PTSD and atypical anxiety); MDD recurrent unspecified 296.3. She noted an Axis V score of 50. She recommended Zoloft; continued treatment with her therapist, encouraged to seek admission to MHC program.

**Joseph Henry Tyler, Jr. - Mental Health Center** - (Tr. 156-178).

On February 2, 2005, Worrell presented at the Tyler Mental Health Center, complaining of depression, crying spells, becoming angered easily, feeling worthless, helpless, short term memory loss, and admitted thinking of suicide.[9] She felt nervous and worried and paranoid and

---

[9] Tr. 161.

had racing thoughts. As to daily living skills, she indicated that fixed her own meals; managed her own money; arranged her own transportation; shopped for food; cleaned her own living quarters; performed her own hygiene; cleaned her own clothes; and functioned as a caregiver.[10] She indicated that she was working and had been working doing on-site security at an apartment complex for 3 years. She did cross stitch and arts and crafts for recreation.[11]

Her treatment plan on February 14, 2005 noted a diagnosis of Bipolar Disorder Type II and Post traumatic stress disorder and migraine headaches.[12] It noted an Axis V score of 30 which represented the highest such score over the past six months.

Progress notes on February 25, 2005 indicate that Worrell had suicidal thoughts when she felt trapped; poor impulse control; self-mutilation when she was young; depressed mood; crying spells; difficulty falling asleep; no psychosis; two manic episodes in the past. She agreed to take Wellbutrin and Lamictal.

**Dr. Joseph K. Kahler, Ph.D.** (Tr. 140-142) On February 22, 2005, at the request of the SSA, consulting psyhchologist Joseph K. Kahler, Ph.D., completed a Psychiatric Review Technique ("PRT") and a Mental RFC Assessment.[13] Dr. Kahler never examined Worrell.

In the PRT, Dr. Kahler noted recurrent major depressive disorder, and anxiety disorder.

In the RFC assessment, discussed in more detail *infra*, Dr. Kahler opined that Worrell was moderately limited in her ability to: maintain attention and concentration for extended

[10] Tr. 163.

[11] Tr. 164.

[12] Tr. 159.

[13] Tr. 140-142.

periods; perform activities within a schedule, maintain regular attendance; and be punctual with customary behavior; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.[14]

### *Administrative Hearing*

At the administrative hearing in March, 2006, Worrell testified that she lived with her boyfriend and son.[15] She was 6 ½ months pregnant.[16] She denied being on medication since she was pregnant but was on Wellbutrin and Lamictal before.[17] Worrell testified that she was a security guard at the Maison d'Esprit Apartments run by the Catholic Diocese in return for a free apartment and utilities.[18] She also worked as a home health aide for a couple of years.[19] Before that she worked at Exxon, Burger King, Friday's, What A Burger, Delchamps, Amber's Arts and Crafts, and Dominoes.[20] She indicated that she was fired from Dominoes, Burger King and Delchamps because of anger issues, and from Exxon for missing work.[21]

---

[14] Tr. 140-141.

[15] Tr. 321.

[16] Tr. 322.

[17] Tr. 323.

[18] Tr. 320, 323-324.

[19] Tr. 324.

[20] Tr. 325-326.

[21] Tr. 326.

Worrell testified that she wasn't sure how often she had anxiety attacks, sometimes almost everyday, sometimes every other day.[22] When she has an anxiety attack, she cannot continue normally doing what she was doing.[23] As to her bipolar disorder, Worrell testified that her depression was such that she was suicidal.[24] She testified she experiences depression every day, but days some are worse than others.[25] As to her mania, she has days when she cannot sleep.[26] She also testified that she has intrusive thoughts of past abuse and recurring headaches.[27] She testified she is unable to maintain concentration when she is badly depressed or has an anxiety attack.[28]

She testified that she gets up between 6:30 and 6:45 to get her son ready for school, does her floors about once a week, and does whatever dishes need to be done.[29] She testified she does not drive.[30] She testified she tries not to go out unless she is going shopping and visits only with her relatives.[31] She testified that every once in a while tries to paint.[32]

---

[22] Tr. 327.

[23] Id.

[24] Id.

[25] Tr. 328.

[26] Tr. 328-329.

[27] Tr. 329.

[28] Tr. 330.

[29] Tr. 331-332.

[30] Id.

[31] Tr. 333.

[32] Tr. 333.

During the hearing, a vocational expert, Thomas Lafosse, was called to testify. The vocational expert testified that given Worrell's RFC as identified by the ALJ, Worell could work as a machine operator; product inspector, tester, sorter, sampler, or weigher; packing and filling machine operator or tender.[33]

***Findings and Conclusions***

The issue before the court is whether Worrell can sustain employment. The ALJ determined that Worrell had the residual functional capacity to perform work at all exertional levels requiring her to have no persistent interaction with co-workers and no interaction with the general public.[34] He found that Worrell can sustain employment, reasoning that:

> Despite her symptoms of depression and anxiety, the claimant worked at substantial gainful activity until May 2, 2002 and as late as April 21, 2005, she reported her job was going well. On intake at the mental health center, the claimant reported that she prepares her own meals, manages her own money, arranges her own transportation, shops for food, cleans her own home, performs hygiene, cleans her own clothes and functions as a caregiver for her son. As of that time, she had worked on-site at the apartment complex for three years, thus indicating an ability to perform work within reasonable job expectations for a sustained period of time.[35]

In determining that Worrell can sustain a job, the ALJ gave "significant weight" to the opinion of Dr. Joseph K. Kahler, Ph.D.:

> On February 22, 2005, Dr. Kahler opined that the claimant retains the functional capacity to perform moderately complex, low-stress work. Though he did not identify the type of work activities that may fall within the "low-stress" category,

---

[33] Tr. 341-341.

[34] Tr. 19.

[35] Tr. 20.

> it seems that this claimant's primary work-related difficulties have arisen from limitations in her ability to interact with others.[36]

The ALJ also noted that "Worrell testified that she is unable to hold a job because people bother her too much and would prefer to simply stay in the house if she could."[37] He noted that, although Worrell reported long-term mental health problems, including a suicide attempt when she was a teenager, Worrell had been able to work at semi-skilled jobs and maintain her home and care for her child.[38] The ALJ concluded that Worrell was "able to attend and concentrate to the extent required by full-time activity consistent with her educational achievement."[39]

A review of the record shows that substantial evidence does not support the ALJ's determination. Worrell was treated in 2005 for mental illnesses, including depression, Bipolar Disorder, anxiety, and Post Traumatic Stress Disorder.[40]

Worrell argues that the ALJ ignored vocationally relevant opinions of Dr. Kahler without explaining his reasons and, as a result, the ALJ's residual functional capacity assessment was erroneous and, thus, not supported by substantial evidence.[41] The undersigned agrees.

Dr. Kahler's functional capacity assessment of Worrell was that her symptoms of :

> anxiety and dysphoric mood . . . may moderately limit her ability to concentrate for long periods, which in turn might affect her ability to perform activities within a schedule to some extent. Her pace may fluctuate with situational exacerbations of mood distress. She may be quite sensitive to harsh supervisory criticism

---

[36] Tr. 20.

[37] Id.

[38] Id.

[39] Id.

[40] Tr. 135-139, 156-170, 171-178.

[41] Worrell's Memorandum, Rec. Doc. 8.

> because of her relatively high baseline anxiety, however, she should respond well to gentle correction and she would be able to accept instructions without problems. Claimant appears to be of average intellect and to retain the capacity for simple to moderately complex, low stress work.

As noted above, Dr. Kahler also opined that Worrell was moderately limited in her ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance; and be punctual with customary behavior; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.[42] He also concluded that she was moderately limited in her ability to accept instructions, and respond appropriately to criticism from supervisors. Dr. Kahler also opined that, while she had mild restrictions of daily living, she had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. Although the ALJ purported to give significant weight to Dr. Kahler's opinion, he ignored *these* opinions of Dr. Kahler.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Martinez v. Chater, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, Moore v. Sullivan, 919 F.2d 901, 905 (5th cir. 1990). However, ". . . the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position. Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000).

[42] Tr. 140-141.

The ALJ gives no reason for rejecting the medical evidence provided by Dr. Kahler but instead interjects his own opinion. He bases his conclusion that Worrell's primary work related difficulties have arisen from limitations in her ability to interact with others on Worrell's testimony that she had been fired from several jobs and her reports to her treatment providers. Worrell, however, also testified that she has anxiety attacks which occurred sometimes almost everyday, sometimes every other day. She testified that, when these attacks occur:

> I feel like I could be pale white, but I'm sweating a lot, my nerves are bad. Kind of get, my chest feels like it's hurting. What else? I just, I know I have to get out of whatever I'm doing or whatever. I gotta do something or else it can escalate into something.[43]

She testified she experiences depression every day but some days are worse than others.[44] When she has a significant depression, she testified, "I don't do anything."[45] She testified she is unable to maintain concentration when she is badly depressed or has an anxiety attack.[46] She has recurring or intrusive thoughts everyday, remembering her history of abuse by her biological father and her son's father.[47] Worrell testified that she was fired from several jobs or quit because of confrontations with either co-workers, supervisors, or customers.[48]

---

[43] Tr. 327.

[44] Tr. 328.

[45] Id.

[46] Tr. 330.

[47] Tr. 329.

[48] Tr. 326.

Worrell's complaints are supported by the record as are Dr. Kahler's opinions.[49] On January 24, 2005, psychiatrist Mary Margaret Gleason, M.D., examined Worrell.[50] She opined:

> [Worrell's] early childhood physical abuse by her father as well as prolonged physical abuse by her former partner, father of her child, likely make her more vulnerable to mood and anxiety symptoms and also likely impacted her ability to develop a full spectrum of coping skills.[51]

Dr. Gleason concluded that Worrell's experiences were likely to contribute to her stated difficulty with trusting people.[52] Clearly, an inability to trust people would directly relate to the lack of an ability to accept criticism from supervisors. Dr. Gleason also concluded that Worrell's family's history may predispose her to mood and anxiety symptoms.[53] She prescribed the anti-depressant, anti-anxiety drug Zoloft.[54] She encouraged Worrell to seek admission at the Medical Health Center.

The records from Tyler Mental Health Center also support the conclusion that Worrell suffers from debilitating anxiety and depression.[55] These records corroborate Dr. Kahler's opinions that Worrell has limitations in the areas of attention and concentration; ability to perform activities within a schedule; ability to maintain regular attendance; ability to complete a

---

[49] There is no dispute that Worrell was the victim of childhood abuse by her father and as an adult by the father of her child.

[50] Tr. 135-139.

[51] Tr. 137.

[52] Id.

[53] Id.

[54] Zoloft is approved to treat depression, social anxiety, posttraumatic stress disorder, panic disorder, obsessive-compulsive disorder, and premenstrual dysphoric disorder. http://www.zoloft.com/zoloft/zoloft.portal?_nfpb=true&_pageLabel=about_zoloft

[55] *See* discussion *supra*, pp. 4-5.

normal work-week; and ability to accept instructions and respond appropriately to criticism from supervisors.[56]

There is no substantial evidence to support the ALJ's conclusion that Worrell has the residual functional capacity to perform work at all exertional levels, as long as she has no persistent interaction with co-workers and no interaction with the general public. The record shows that Worrell has severe impairments which limit her ability to interact with others, as well as her ability to persist, work and concentrate on a consistent basis.

The vocational expert testified that an individual of Worrell's age and vocational background who is additionally limited not only in her ability to interact with co-workers or the general public, but also in her ability to persist on a regular and consistent basis, would not be able to maintain employment.[57]

In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required

---

[56] The Commissioner's sole argument is that Worrell has "cherry picked" Dr. Kahler's conclusions because she fails to mention that he concluded that she was only mildly limited in her ability to engage in substantial activities of daily living and had no episodes of decompensation and emphasizes the MHC reports which were 14 years after she became disabled and three years after she stopped working. Whether or not she was mildly limited in her activities of daily living in no way undermine Dr. Kahler's opinions as to her other vocationally relevant limitations. Moreover, the Commissioner has offered no authority for its argument that the 2005 progress notes should be disregarded and which are relevant to support Worrell's testimony regarding her long-term illness which began in her teenage years.

[57] Tr. 342.

> physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

Considering that Worrell cannot maintain employment, and the fact that the vocational expert testified that employers would not tolerate an employee's inability to perform activities within a schedule, absences, inattention, and inability to accept instruction and criticism from supervisors,[58] the undersigned finds that the ALJ's determination that Worrell could perform work on a sustained basis is not supported by substantial evidence.

***Conclusion***

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and that Worrell be awarded benefits consistent with an onset date of May 2, 2002.[59]

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10)**

---

[58] Tr. 344-345.

[59] A judgment entered adopting this Report and Recommendation constitutes a "final judgment" that triggers the filing period for an EAJA fee application. Shalala v. Schaeffer, 509 U.S. 292, 113 S.Ct. 2625, 2631 (1993); Freeman v. Shalala, 2 F.3d 552 (5th Cir. 1993).

**days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on March 18, 2008.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)